## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **ELEVANCE HEALTH, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) **CIVIL ACTION NO.** 1:23-cv-1440 |
| **v.** | ) |
| | ) |
| **MICHAEL GONZALEZ,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## VERIFIED COMPLAINT

Plaintiff Elevance Health, Inc., f/k/a Anthem Inc. ("Elevance Health"), by and through its undersigned attorneys, for its Verified Complaint against Michael Gonzalez ("Gonzalez"), alleges as follows:

## NATURE OF ACTION

1.     This is an action for damages and injunctive relief brought by Elevance Health, an Indianapolis-based business, against Gonzalez, a former highly compensated senior executive who has flagrantly violated the restrictive covenant obligations in numerous equity award agreements (collectively, the "Equity Agreements," attached hereto as **Exhibits 1-5**) in which, in exchange for valuable consideration, he agreed to refrain from engaging in certain competitive activities for twelve months following his employment with Elevance Health to preserve Elevance Health's legitimate business interests.

2.     Gonzalez previously led the sales team for Elevance Health's Medicare business in its entire East Region, which includes the state of Georgia and six other states on the East coast of the United States, as well as two other states where Elevance operates as a joint venture.  Despite his obligations to Elevance Health, and despite repeated warnings by Elevance Health that it

expects him to honor his obligations in their entirety, Gonazlez is currently providing services to a direct competitor of Elevance Health to obtain an unfair advantage over Elevance Health in the market for Medicare plans in the state of Georgia – a business that, in the state of Georgia alone, is worth millions of dollars annually.  Absent injunctive relief, Elevance faces the prospect of suffering immediate irreparable harm from a former executive who is competing against it in the Medicare business armed with its highly confidential and proprietary information and its longstanding provider and broker relationships.  Elevance Health, therefore, files this Verified Complaint to obtain injunctive relief and to recover damages for the harm already caused to its business by Gonzalez's actions.

## PARTIES

3.     Plaintiff Elevance Health, Inc. is an Indiana corporation with its principal place of business in Indianapolis, Indiana.  Elevance Health is registered to do business in the State of Indiana.

4.     Defendant Michael Gonzalez is an individual and a citizen of Connecticut.  Gonzalez is domiciled in Connecticut and resides at 59 Beaver Dam Road, Killingworth, Connecticut 06419.

## JURISDICTION

5.      This Court may exercise jurisdiction over Count III of this Complaint because it arises under the laws of the United States, namely the Defend Trade Secrets Act, 18 U.S.C. § 1836. Accordingly, this Court has original jurisdiction over that claim under 28 U.S.C. § 1331.

6.      The Court also has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 because complete diversity exists and the amount in controversy is in excess of $75,000.

7.      Elevance Health is a citizen of Indiana, and Gonzalez is a citizen of Connecticut. Thus, complete diversity is present.

8.      The amount in controversy is in excess of $75,000.  As discussed in detail below, Elevance Health seeks to recover compensatory damages, injunctive relief, and its attorneys' fees and costs. Elevance Health's claim for compensatory damages alone is far in excess of $75,000. The injunctive relief sought is also far in excess of $75,000, because, absent the entry of injunctive relief, Gonzalez will be free to compete against Elevance Health using Elevance Health's trade secrets and other Confidential Information (as defined in the Equity Agreements) by leveraging Elevance Health's provider and broker goodwill with which he was entrusted during his employment with Elevance Health, resulting in damages to Elevance Health well in excess of the jurisdictional minimum.

## PERSONAL JURISDICTION AND VENUE

9.      Personal jurisdiction and venue is proper in this District and Division because Gonzalez's Equity Agreements incorporate by reference the terms of Elevance Health's 2017 Anthem Incentive Compensation Plan (the "Incentive Compensation Plan") (attached as **Exhibit 11**).  The Incentive Compensation Plan includes a mandatory forum-selection clause setting venue

exclusively in federal and state courts of Indiana for any disputes "[t]hat may arise out of or relate to the Plan or any related agreements." (Incentive Compensation Plan § 21.11.)

## FACTUAL ALLEGATIONS

### A.    *Elevance Health's Legitimate Business Interests*

10.    Elevance Health is one of the nation's leading health care benefit companies, serving millions of Americans across the United States through its affiliated plans.  Elevance Health is an independent licensee of the Blue Cross and Blue Shield Association and serves its members as the Blue Cross licensee for California and as the Blue Cross and Blue Shield licensee for Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia and Wisconsin.  Elevance Health also conducts business in Louisiana, South Carolina, and western New York through its arrangements with other BCBS licensees, and serves customers in over 25 states through its subsidiaries.

11.    Elevance Health's medical membership includes seven different customer types: Local Group, Individual, National Accounts, BlueCard, Medicare, Medicaid and the Federal Employment Program (or FEP).  Elevance Health offers a broad spectrum of network-based managed care plans in the Large Group, Small Group, Individual, Medicaid and Medicare markets, as well as a broad array of managed care services to self-funded customers.  Elevance Health also offers an array of specialty and other insurance products, such as dental, vision, and life insurance, and a Pharmacy Benefits Manager (or PBM).

12.    As the Blue Cross Blue Shield licensee and through its subsidiaries, Elevance Health serves members enrolled in Medicare Advantage Part D plans in Arkansas, California, Colorado, Florida, Georgia, Indiana, Iowa, Kentucky, Louisiana, Maryland, Minnesota, Nevada, New Jersey, New York, South Carolina, Tennessee, Texas, Virginia, Washington, West Virginia, Wisconsin, and the District of Columbia.

13.     Among its plan offerings, Elevance Health offers Chronic Condition Special Needs Plans (C-SNPs) to people eligible for Medicare and dealing with a chronic or disabling condition. These plans include C-SNPSs for people with diabetes mellitus and cardiovascular disorders, among other chronic conditions.   Moreover, Elevance Health also offers several "dual-eligible" programs including Dual Special Needs Plans ("D-SNPs") and Medicare-Medicaid Plans ("MMPs") to people eligible for both Medicare and Medicaid benefits.

14.     Elevance Health operates in a highly competitive industry in which its success is a result of years of hard work and ingenuity.  Elevance Health's confidential, proprietary, and trade secret information and administrative and operational acumen allow it to maintain market share and thrive in this extremely competitive industry.  Elevance Health's business is profitable by virtue of its strategic structuring and implementation of its distribution networks (including broker relationships), provider networks, portfolio of member benefit plans, and substantial investments in operational improvement, all of which is driven by information that is regarded as highly confidential by Elevance Health and its competitors.  Elevance Health has developed and maintained its competitive position in the market in large part because of this confidential and proprietary information, which Elevance Health takes significant measures to safeguard from public dissemination.

15.     To maintain Elevance Health's competitive advantage and position in the marketplace, Elevance Health expends substantial time, effort, and expense developing trade secrets and other confidential business information, which include, but are not limited to: provider and broker lists; competitive intelligence about Medicare bidding opportunities; internal analyses of market position, threats, and opportunities; strategic plans for Medicare bidding; strategic sales and marketing plans; plan administration information and financial metrics; compensation

structures; and other business methods, strategies, and plans, including sales strategies and methods.

16.    To protect its trade secrets and other confidential and proprietary business information, Elevance Health stores its trade secrets and confidential information on secure computer systems.  In addition, the information is compiled and stored in password-protected electronic databases, including proprietary internal programs through which Elevance Health aggregates and monitors information relating to its operations.  Access to confidential information is further restricted to specific user profiles so that users on the network have access only to specific folders rather than the entire universe of Elevance Health's trade secrets and confidential information.

17.    Elevance Health has also spent a significant amount of time and money cultivating its member, broker, and provider relationships in Georgia and elsewhere through its Market Director, Regional Sales Managers, Telesales, and Field Sales and Service Representatives. Because Elevance Health's business contains a service component, the relationships that Elevance Health has with members are keenly dependent on Elevance Health's healthcare provider relationships and on its member-facing employees.  If a health care provider recommends that a member switch to a different HMO or to a different C-SNP, D-SNP, or MMP, the member is likely to follow the provider's recommendation.  Likewise, if a broker recommends that an existing member switch to a different HMO or to a different C-SNP, D-SNP, or MMP, or recommends a non-Elevance Health plan to a prospective member, the member or prospective member is likely to follow the broker's recommendation.  Indeed, because approximately 80% of members of Medicare Advantage plans purchase their insurance through brokers, broker relationships are particularly essential to Elevance Health's success in the Medicare business.  Moreover, Elevance

Health's Regional and Market Leaders, Regional Sales Managers and Field Sales and Service Representatives are encouraged to develop relationships with community centers of influence and members to ensure member loyalty to the associated plan.

      **B.**     ***Gonzalez's Employment With Elevance Health and Access to Elevance Health's Highly Confidential Information and Provider and Broker Goodwill***

18.     On December 29, 2017, Gonzalez joined Elevance Health (then known as Anthem Inc.) as the Regional Vice President of Sales in the company's Medicare business unit.

19.     In this role, Gonzalez was responsible for directing sales and member retention for Elevance Health's Medicare plans in the company's East Region, which is comprised of several states in the eastern United States, including Georgia. His duties included directing and coordinating sales activities (including the activities of Elevance Health's State Director, Regional Broker staff, and Field Sales and Service Representatives in the East Region), providing leadership and strategic direction of the Medicare sales team to ensure profitable growth, and developing strategies and executing sales plans to achieve membership growth and financial goals.

20.     As part of these duties, Gonzalez was responsible for constantly evaluating the performance of Elevance Health's Medicare plans in the East Region, including Georgia, in preparation for the company's submission of its "bid" (i.e., its submission of its detailed plan benefits and the counties in which they will be offered) to the Centers for Medicare & Medicaid Services ("CMS").

21.     Companies offering Medicare Advantage plans are required to submit their bids to CMS for all plans on the first Tuesday of June in the calendar year before the plan will go into effect. (For example, for 2024 Medicare plans, bids were submitted on June 6, 2023.) With respect to Medicare Advantage Plans, Elevance Health, like its competitors, focuses its sales efforts in the months prior to the open enrollment period for such plans, which, for 2024 plans, will occur from

October 15 to December 7, 2023.  Members of HMO plans can typically switch their membership to another plan only during the open enrollment period.  In contrast, because members of C-SNP and D-SNP plans can switch their plans at any time, and not merely during the open enrollment period for HMOs, Elevance Health competes with competitors for member retention throughout the year.

22.     As Regional Vice President of Sales at Elevance Health, Gonzalez was responsible for cultivating relationships with brokers (personally and through his subordinates) throughout the year and was privy to highly confidential information regarding Elevance Health's sales strategies and the financial performance of its Medicare plans.

23.     For example, Gonzalez had access to Elevance Health's analysis of the performance of each of its Medicare plans in every county in Georgia in which those plans are offered, as well as the financial performance of Elevance Health's Medicare plans in all other states in the East Region.  He had access to Elevance Health's analysis of its Medicare plans' competitive position in each county in Georgia in which they are offered relative to competing plans in the same counties, including Elevance Health's weaknesses and vulnerabilities, and competitive intelligence about competitors' performance in the same markets.  He had access to data about disenrollment trends in all markets in which Elevance Health's Medicare plans are offered, as well as Elevance Health's strategies to decrease disenrollment and increase member growth.  He had intimate knowledge of Elevance Health's entire distribution network of agencies and brokers of all sizes in Georgia and elsewhere.  And he was personally responsible for developing Elevance Health's detailed strategy for increasing sales of its Medicare business in Georgia and elsewhere and its strategy for marketing its plans to brokers in Georgia and elsewhere.

This includes staffing strategy, marketing investments and tactics, budget allocation, sales activity scheduling, long term growth plans, and progress toward those targets.

    **C.**    ***Gonzalez Receives Equity in Elevance Health in Exchange for Restrictive Covenant Obligations***

    24.    During his employment with Elevance Health as a highly compensated senior executive, Gonzalez received the opportunity to participate in Elevance Health's Incentive Compensation Plan and receive stock options, restricted stock grants, and performance stock unit grants.

    25.    On or about March 1, 2021, Gonzalez received an award of 179 shares of nonqualified stock options to purchase shares of Elevance Health stock, as well as an award of restricted stock grants for 89 shares of Elevance Health stock, and an award of 44 performance stock units, all subject to conditions enumerated in the notices accompanying those awards.  (*See* March 1, 2021 Notice of Option Grant, **Exhibit 1**; March 1, 2021 Notice of Restricted Stock Unit Grant, **Exhibit 2**; March 1, 2021 Notice of Performance Stock Unit Grant, **Exhibit 3**) (collectively, the "2021 Equity Agreements").

    26.    On or about March 1, 2022, Gonzalez received an award of 132 shares of nonqualified stock options to purchase shares of Elevance Health stock, as well as an award of 33 performance stock units, all subject to conditions enumerated in the notices accompanying those awards.  (*See* March 1, 2022 Notice of Option Grant, **Exhibit 4**; March 1, 2022 Notice of Option Grant, **Exhibit 5**) (collectively, the "2022 Equity Agreements").

    27.    The Equity Agreements contain restrictions on Gonzalez's ability to use Elevance Health's confidential information, to compete against Elevance Health, and to solicit Elevance Health's customers, providers, and employees.

28.     In Section 7(a) of the Equity Agreements, Gonzalez recognized that Elevance Health derives substantial economic value from its "Confidential Information," which is defined to include:

> plans, designs, concepts, computer programs, formulae, and equations; product fulfillment and supplier information; customer and supplier lists, and confidential business practices of the Company, its affiliates and any of its customers, vendors, business partners or suppliers; profit margins and the prices and discounts the Company obtains or has obtained or at which it sells or has sold or plans to sell its products or services (except for public pricing lists); manufacturing, assembling, labor and sales plans and costs; business and marketing plans, ideas, or strategies; confidential financial performance and projections; employee compensation; employee staffing and recruiting plans and employee personal information; and other confidential concepts and ideas related to the Company's business.

(*Id.* § 7(a).)  "Confidential Information" is also defined to include information protected by the Indiana Uniform Trade Secrets Act, unless such information is known to Gonzalez or the general public through means other than a breach of a duty to maintain the confidentiality of such information.

29.     Gonzalez agreed that, for so long as Elevance Health's Confidential Information remained confidential, he would not:

> (A) use Confidential Information for the benefit of any person or entity other than the Company or its affiliates; (B) remove, copy, duplicate or otherwise reproduce any document or tangible item embodying or pertaining to any of the Confidential Information, except as required to perform the Participant's duties for the Company or its affiliates; or (C) while employed and thereafter, publish, release, disclose or deliver or otherwise make available to any third party any Confidential Information by any communication, including oral, documentary, electronic or magnetic information transmittal device or media.

(*Id.*)

30.     In Section 7(b) of the Equity Agreements, Gonzalez agreed to the following restriction on his ability to compete against Elevance Health:

> During any period in which the Participant is employed by the Company, and during a period of time after the Participant's termination of employment (the "Restriction Period") which, unless otherwise limited by applicable state law, is (i)

twenty-four (24) months for Executive Vice Presidents and the President & Chief Executive Officer, and (ii) the greater of the period of severance or twelve (12) months for all other Participants, the Participant will not, without prior written consent of the Company, directly or indirectly seek or obtain a Competitive Position in a Restricted Territory and perform a Restricted Activity with a Competitor, as those terms are defined herein.

> (i) Competitive Position means any employment or performance of services with a Competitor (A) the same as or similar to the services in which Participant performed for the Company in the last twenty-four (24) months of Participant's employment with Company, or (B) in which the Participant will use any Confidential Information of the Company.

> (ii) Restricted Territory means any geographic area in which the Company does business and in which the Participant provided services in, had responsibility for, had a material presence or influence in, or had access to Confidential Information about, such business, within the thirty-six (36) months prior to the Participant's termination of employment from the Company.

> (iii) Restricted Activity means any activity for which the Participant had responsibility for the Company within the thirty-six (36) months prior to the termination of the Participant's employment from the Company or about which the Participant had Confidential Information.

> (iv) Competitor means any entity or individual (other than the Company or its affiliates) engaged in management of network-based managed care plans and programs, or the performance of managed care services, health insurance, long term care insurance, dental, life or disability insurance, behavioral health, vision, flexible spending accounts and COBRA administration or other products or services substantially the same or similar to those offered by the Company while the Participant was employed, or other products or services offered by the Company within twelve (12) months after the termination of Participant's employment if the Participant had responsibility for, or Confidential Information about, such other products or services while the Participant was employed by the Company.

(Equity Agreements § 7(b).)

31.     In Section 7(c) of the 2021 Equity Agreements, Gonzalez agreed to the following

restriction on his ability to solicit Elevance Health's customers and accounts:

> During any period in which the Participant is employed by the Company, and during the Restriction Period after the Participant's termination of employment, the Participant will not, either individually or as an employee,

11

partner, consultant, independent contractor, owner, agent, or in any other capacity, directly or indirectly, for a Competitor of the Company as defined in subsection (b) above: (i) solicit business from any client or account of the Company or any of its affiliates with which the Participant had contact, participated in the contact, or responsibility for, or about which the Participant had knowledge of Confidential Information by reason of the Participant's employment with the Company, (ii) solicit business from any client or account which was pursued by the Company or any of its affiliates and with which the Participant had contact, or responsibility for, or about which the Participant had knowledge of Confidential Information by reason of the Participant's employment with the Company, within the twelve (12) month period prior to termination of employment.  For purposes of this provision, an individual policyholder in a plan maintained by the Company or by a client or account of the Company under which individual policies are issued, or a certificate holder in such plan under which group policies are issued, shall not be considered a client or account subject to this restriction solely by reason of being such a policyholder or certificate holder.

(*Id.* § 7(c).)

32.     Similarly, in Section 7(c) of the 2022 Equity Agreements, Gonzalez agreed to the

following restriction on his ability to solicit Elevance Health's customers and accounts:

During any period in which the Participant is employed by the Company, and during the Restriction Period after the Participant's termination of employment, the Participant will not, either individually or as an employee, partner, consultant, independent contractor, owner, agent, or in any other capacity, directly or indirectly, for a Competitor of the Company as defined in subsection (b) above: (i) solicit business from any client, account, or medical care provider of the Company or any of its affiliates with which the Participant had contact, participated in the contact, or responsibility for, or about which the Participant had knowledge of Confidential Information by reason of the Participant's employment with the Company, (ii) solicit business from any client, account, or medical care provider which was pursued by the Company or any of its affiliates and with which the Participant had contact, or responsibility for, or about which the Participant had knowledge of Confidential Information by reason of the Participant's employment with the Company, within the twelve (12) month period prior to termination of employment. For purposes of this provision, an individual policyholder in a plan maintained by the Company or by a client or account of the Company under which individual policies are issued, or a certificate holder in such plan under which group policies are issued, shall not be considered a client or account subject to this restriction solely by reason of being such a policyholder or certificate holder.

(*Id.* § 7(c).)

33.     In Section 9(a) of the Equity Agreements, Gonzalez acknowledged that the restrictive covenants in the Equity Agreements "are reasonable and necessary to preserve the legitimate business interests of the Company, its present and potential business activities and the economic benefits derived therefrom; that they will not prevent him or his from earning a livelihood in the Participant's chosen business and are not an undue restraint on the trade of the Participant, or any of the public interests which may be involved."

34.     In Section 9(b) of the Equity Agreements, Gonzalez agreed that the term of the restrictive covenants would be extended by the period that Gonzalez was not in compliance with the Equity Agreements.

### D.     *Gonzalez Joins Sonder Health Plans, Inc. in Violation of the Equity Agreements*

35.     On December 8, 2022, Gonzalez's employment with Elevance Health terminated for cause after the company learned that Gonzalez had approved a broker incentive contest that violated Elevance Health's policies.  Following the termination of Gonzalez's employment with Elevance Health, Elevance Health offered Gonzalez a severance package, which Gonzalez ultimately did not accept.

36.     During the course of Elevance Health and Gonzalez negotiating the terms of the proposed severance package through their respective counsel, Elevance Health reminded Gonzalez that it takes non-competition obligations very seriously and expects Gonzalez to comply with all continuing obligations in the Equity Agreements.  Accordingly, on March 28, 2023, Gonzalez, through his counsel, requested that Elevance Health agree to waive the non-competition covenant in the Equity Agreements so that it would not apply to a competitor with fewer than 2,000 members.

37.     While Elevance Health was considering the request, Elevance Health received an anonymous tip that Gonzalez was violating his Equity Agreements and was employed by Sonder Health Plans, Inc. ("Sonder").

38.     Like Elevance Health, Sonder is a health care benefits company, and it competes directly with Elevance Health in several counties in Georgia, including the metro-Atlanta counties of Cherokee, Clayton, Cobb, Coweta, DeKalb, Douglas, Fulton, Gwinnett, Henty, Paulding, and Rockdale.  Indeed, like Elevance Health, Sonder offers a Medicare Advantage Part D plan, as well as a D-SNP plan and C-SNPs for people with diabetes mellitus and cardiovascular disorders, in the same counties in which Elevance Health offers its Medicare Advantage, D-SNP, and C-SNP plans in the state of Georgia.

39.     Moreover, Elevance Health received information from witnesses who reported seeing Gonzalez taking pictures at Elevance Health's Anthem-branded marketing site in front of Grady Hospital in downtown Atlanta, Georgia.  Gonzalez had no reason to be at Elevance Health's marketing site in Atlanta, let alone taking pictures presumably used for competitive purposes.

40.     Because Sonder and Elevance Health compete directly in Georgia, Gonzalez's employment with Sonder posed (and continues to pose) a particularly pointed risk to Elevance Health's trade secrets and other Confidential Information.  At the time of its receipt of the anonymous tip, Elevance Health was in the middle of the Medicare Advantage bid season. Elevance Health's trade secrets and the other Confidential Information about which Gonzalez has knowledge are the precise types of information that a competitor like Sonder could use to prepare its own Medicare Advantage bid, to prepare for the 2024 open enrollment period, and to obtain an unfair advantage over Elevance Health for the remainder of 2023 and for the 2024 plan year.

41.     Accordingly, upon Elevance Health's receipt of the anonymous tip that Gonzalez was working for Sonder, Elevance Health, through its in-house counsel, confronted Gonzalez, through his counsel, regarding his suspected violation of the Equity Agreements and demanded that he confirm his continued compliance with his obligations.  Specifically, on April 10, 2023, Elevance Health's counsel emailed Gonzalez's counsel:

> Thank you for your email dated March 28, 2023, wherein you requested that Elevance Health consider carving out a non-compete exception that would allow your client to work for a Company that has fewer than 2,000 members.  My client has considered Mr. Gonzalez's request and has decided that it must decline your client's request for a myriad of reasons.  As it stands, Mr. Gonzalez's non-compete obligations will remain intact for the entirety of its duration.

> On another note, as you may recall, during our initial phone call, I did advise you that Elevance Health takes associate non-competition obligations very seriously and does initiate legal intervention, when warranted.  Suffice to say, I find it disappointing that Elevance Health recently received an anonymous tip advising that your client is currently employed by Sonder Health Plans in Georgia.  I need not tell you that, if, in fact, true, your client is direct violation of his non-compete obligations and Elevance Health will have no other option but to move forward accordingly.   By virtue of this note to you, and it is my hope that this anonymous tip is in error, I am asking your client to attest to the fact that he is not employed with Sonder Health Plans and, furthermore, is not engaged in any activity in violation of his non-compete obligations.  Such seems especially disingenuous in light of your client's recent request.  Again, I hope that the tip is in error, but, in the event you cannot produce such, Elevance Health will have no option but to aggressively pursue its rights which may very well end up to be a costly adventure for your client.

> Please advise as soon as possible as to the aforementioned.  Thank you for your anticipated courtesy in this regard.

(*See* April 10, 2023 email from Lauren Klionsky to Matthew C. Smith (attached as **Exhibit 6**).)

42.     Despite this demand, neither Gonzalez nor his counsel responded to the email from Elevance Health's in-house counsel.  Accordingly, on April 27, 2023, Elevance Health, through outside counsel, sent a formal cease and desist letter to Gonzalez through his counsel, once again reminding Gonzalez of his continuing obligations and once again demanding that he confirm that

he is not employed by, or providing services to, Sonder.  (*See* April 27 letter from Daniel P. Hart to Matthew C. Smith (attached as **Exhibit 7**).)

43.    In addition, Elevance sent correspondence to Sonder putting Sonder on notice of Gonzalez's continuing obligations and demanding that Sonder confirm that Gonzalez is not providing any services to Sonder and will not provide any services to Sonder in violation of his continuing obligations while they are in effect.  (*See* April 27 letter from Daniel P. Hart to Suzanna Roberts (attached as **Exhibit 8**).)

44.    Neither Gonzalez nor his counsel provided any substantive response to Elevance Health's correspondence.  Instead, on May 5, 2023, Gonzalez sent an email to Elevance Health's counsel representing that he was "currently in the process of securing legal counsel in Georgia" and would "promptly provide [Elevance Health's counsel] with their contact information so that [he] may coordinate with them on this matter."  (*See* May 5, 2023 email from Michael Gonzalez to Daniel P. Hart (attached as **Exhibit 9**).)

45.    Despite this representation, no further communication was forthcoming from Gonzalez or anyone representing him.  Instead, on May 5, counsel for Sonder spoke with counsel for Elevance Health and represented that, although Gonzalez was previously engaged by Sonder on a project as a consultant, he was not currently working for them.  Moreover, Sonder's counsel represented that Gonzalez had told Sonder that Elevance Health had granted him a waiver allowing him to work for a competitor with less than 2,000 members.  Elevance Health's counsel informed Sonder's counsel that no such waiver was granted, thanked her for confirming that Gonzalez was no longer providing services to Sonder, and asked for clarification as to whether Sonder intended to employ or engage Gonzalez at any point in the future while his restrictive covenants were in effect.  Sonder's counsel promised to provide a further response after speaking with Sonder.

46.     In reliance on the representations made by Sonder's counsel that Gonzalez was no longer providing services to Sonder, and in the interest of preserving judicial resources, Elevance Health deferred initiating litigation in the belief that, regardless of his prior violations, Gonzalez was no longer posing an immediate threat to Elevance Health's Confidential Information and other legitimate interests.  Nevertheless, counsel for Elevance Health followed-up with counsel for Sonder on May 17 to confirm that Sonder intended to honor Gonzalez's obligations in the Equity Agreements.  In response, Sonder's counsel represented that a response would be forthcoming on May 24.

47.     Despite this representation, Sonder did not provide the promised response.  Rather, after multiple telephone calls and emails from Elevance Health's counsel, on July 6 – more than two months after representing that Gonzalez was no longer providing services to Sonder and conveniently (for Sonder and Gonzalez) after the deadline to submit 2024 bids to CMS had passed – Sonder finally admitted that "Gonzalez is still providing services to Sonder."  (*See* July 6 email from Anne Chapman to Daniel P. Hart (attached as **Exhibit 10**).

48.     Upon information and belief, Sonder, with the knowledge of Gonzalez, intentionally misled Elevance Health into believing that Gonzalez was no longer providing services to Sonder so that Gonzalez could assist Sonder in preparing its bid to CMS for the 2024 plan year without detection by Elevance Health and without a court enjoining Gonzalez from engaging in clandestine violations of his non-compete obligations.

49.     Gonzalez's ongoing services to Sonder are a direct and blatant violation of his ongoing obligations in the Equity Agreements.  Upon information and belief, Gonzalez is competing with Elevance Health with his knowledge of Elevance Health's trade secrets and other Confidential Information, and he will inevitably use and/or disclose (or is already using and/or

disclosing) Elevance Health's trade secrets and other Confidential Information in the course of performing services for Sonder.

50.     These clear and unambiguous violations of Gonzalez's restrictive covenants and other legal obligations have already seriously harmed Elevance Health in its ability to compete without unfair interference in the Medicare Advantage enrollment period, which begins October 15, and to retain members for its other plans in Georgia.  Indeed, for the year to date, in 2023, Elevance Health has already suffered a 30% increase in its loss of members to Sonder's competing plans in Georgia compared to the entire prior year in 2022.  Notably, this 30% increase in member attrition to Sonder plans represents only the losses to date in the C-SNPs and D-SNPs, as the open enrollment period for HMO members has not even begun.

51.      Without preliminary injunctive relief, Gonzalez will continue to violate his restrictive covenants and use or disclose Elevance's trade secrets and cause irreparable harm to Elevance Health's operations, in addition to significant monetary damages.  There is no adequate remedy at law for the harm that Elevance Health has suffered and is continuing to suffer as a direct and proximate result of Gonzalez's unlawful actions.

## COUNT I
### Breach of Contract - Equity Agreements

52.     Elevance Health re-alleges Paragraphs 1-51 above, and incorporates them as if fully set forth herein.

53.     Gonzalez entered into valid and enforceable contracts, the Equity Agreements, for valuable consideration. Gonzalez has a continuing obligation to abide by the terms of the Equity Agreements and the restrictive covenants contained in those agreements.

54.     The restrictive covenants in the Equity Agreements are reasonably necessary for the protection of Elevance Health's interests in member, broker and provider relationships and

associated goodwill.  Further, the restrictive covenants are reasonably necessary to protect Elevance Health's trade secrets and other Confidential Information.

55.    The covenants contained in the Equity Agreements remain in full force and effect for twelve months after the date of Gonzalez's separation, through December 8, 2023, and Gonzalez remains obligated to comply with those covenants.  Moreover, pursuant to Section 9(b) of the Equity Agreements, Elevance Health is entitled to equitable tolling of the covenants in the Equity Agreements during the time period that Gonzalez is in violation of them.

56.    The restrictive covenants contained in the Equity Agreements are valid and enforceable.  They contain reasonable limitations as to the time, geographic area and scope of activity to be restrained, and do not impose a greater restraint than was necessary to protect Elevance Health's goodwill or other business interests.

57.    Elevance Health has satisfied all of its obligations under the terms and conditions of the Equity Agreements.  All conditions precedent to this action have been performed, excused, or waived.

58.    Elevance Health and Sonder are competitors and compete against each other in the Medicare market segment in Georgia and, in particular, in Medicare Advantage plans, D-SNP plans, and C-SNPS plans for people with diabetes mellitus and cardiovascular disorder in Georgia.

59.    Sonder is an entity "engaged in management of network-based managed care plans and programs, or the performance of managed care services, health insurance, long term care insurance, dental, life or disability insurance, behavioral health, vision, flexible spending accounts and COBRA administration or other products or services substantially the same or similar to those offered by [Elevance Health] while [Gonzalez] was employed, or other products or services offered by [Elevance Health] within twelve (12) months after the termination of [Gonzalez's]

employment if [Gonzalez] had responsibility for, or Confidential Information about, such other products or services while [Gonzalez] was employed by [Elevance Health]."  Sonder is therefore a "Competitor" within the meaning of the Equity Agreements.

60.     Gonzalez is currently providing services to Sonder.  Upon information  and belief, Sonder's only plans are plans in the state of Georgia that compete directly with Elevance Health's plans for which Gonzalez had responsibility as Regional Vice President of Sales, and, accordingly, Gonzalez's services for Sonder are the same as or similar to the services that he performed for Elevance Health in the last twenty-four (24) months of his employment with Elevance Health or are services in which he inevitably will use Elevance Health's Confidential Information.  As such, Gonzalez is employed or engaged by Sonder in a "Competitive Position" within the meaning of the Equity Agreements.

61.     Gonzalez is performing services for Sonder in Georgia.  Georgia is part of the geographic area in which Elevance Health does business and in which Gonzalez provided services for Elevance Health, had responsibility for, had a material presence or influence in, and had access to Confidential Information about within the thirty-six (36) months prior to the termination of his employment from Elevance Health.  Accordingly, Georgia qualifies as a "Restricted Territory" within the meaning of the Equity Agreements.

62.     Gonzalez's activity on behalf of Sonder involves his performance of "Restricted Activity" through his performance of activities related to Sonder's Medicare plans in Georgia that compete with the Elevance Health plans for which he had responsibility at Elevance Health.

63.     By the acts described above, Gonzalez has breached the Equity Agreements by, among other things, providing services to Sonder related to the Medicare market in Georgia that are the same as or similar to the services that he performed for Elevance Health in the last twenty-

four (24) months of his employment with Elevance Health or in which he inevitably will use Elevance Health's Confidential Information.

64.     As a direct and proximate result of Gonzalez's breaches of the Equity Agreements, Elevance Health has been harmed through the use and/or disclosure of its Confidential Information, impairments to its competitive position, loss of members, and unfair competition.

65.     Gonzalez, both directly and through his agents, has breached and will continue to breach the Equity Agreements through the acts detailed in this Complaint.

66.     Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Gonzalez's breach of the Equity Agreements will cause Elevance Health irreparable damage and injury.

67.     The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Gonzalez from such a restraint.

68.     The public interest would not be disserved by the granting of an injunction.

69.     The restrictive covenants contained within the Equity Agreements should be extended for the period of time where Gonzalez is found to have been violated the restrictive covenants in the Equity Agreements.

70.     Elevance Health has been damaged in an amount to be determined at trial.

### COUNT II
### Violation of the Indiana Uniform Trade Secrets Act (IC 24-2-3-1, *et seq.*)

71.     Elevance Health re-alleges Paragraphs 1-51 above, and incorporates them as if fully set forth herein.

72.     Elevance Health's confidential and proprietary information includes, without limitation, provider and broker lists; competitive intelligence about Medicare bidding opportunities; internal analyses of market position, threats, and opportunities; strategic plans for

Medicare bidding; strategic sales and marketing plans; plan administration information and financial metrics; compensation structures; and other business methods, strategies, and plans, including sales strategies and method.

73.     Elevance Health has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

74.     This information constitutes trade secrets pursuant to the Indiana Uniform Trade Secret Act because Elevance Health derives independent economic value, actual or potential, from this information not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use, and because the information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

75.     Elevance Health gave Gonzalez access to its trade secrets through his employment with, and performance of responsibilities for, the company.

76.     Elevance Health's trade secrets contain detailed and specific information about Elevance Health's strategy for the Medicare Advantage bidding process, strategies and information to prepare for and compete in the 2024 open enrollment period, and strategies to compete in general in the Medicare market in Georgia, and they are precisely the types of information that a competitor like Sonder could use to undercut gain a competitive advantage over Elevance Health in the Georgia Medicare market.

77.     Given the nature of the information, Gonzalez will inevitably use and disclose those trade secrets in the course of providing services to Sonder.   Thus, Gonzalez threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Elevance Health's trade secrets and other confidential/proprietary information.

78.     By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Gonzalez.

79.     Gonzalez's threatened misappropriation would cause irreparable harm to Elevance Health for which it has no adequate remedy at law.  Elevance Health cannot presently ascertain the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation.

80.     As such, monetary damages alone cannot fully compensate Elevance Health for Gonzalez's threatened conduct.

81.     Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Gonzalez's threatened misappropriation will cause Elevance Health irreparable damage and injury.

82.     The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Gonzalez from such a restraint.

83.     The public interest would not be disserved by the granting of an injunction.

## <u>COUNT III</u>
### Violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1832 *et seq.*)

84.     Elevance Health re-alleges Paragraphs 1-51 above, and incorporates them as if fully set forth herein.

85.     Elevance Health's confidential and proprietary information includes, without limitation, provider and broker lists; competitive intelligence about Medicare bidding opportunities; internal analyses of market position, threats, and opportunities; strategic plans for Medicare bidding; strategic sales and marketing plans; plan administration information and financial metrics; compensation structures; and other business methods, strategies, and plans, including sales strategies and method.

86.     Elevance Health has taken, and continues to take, reasonable efforts to maintain the confidentiality and secrecy of such information.

87.     This information constitutes trade secrets pursuant to the Defend Trade Secrets Act because Elevance Health derives independent economic value, actual or potential, from this information not being generally known to, and not being readily ascertainable by proper means by, other persons who could obtain economic value from its disclosure or use, and because Elevance Health has taken reasonable measures to keep such information secret.

88.     Elevance Health gave Gonzalez access to its trade secrets through his employment with, and performance of responsibilities for, the company.

89.     Elevance Health's trade secrets contain detailed and specific information about Elevance Health's strategy for the Medicare Advantage bidding process, strategies and information to prepare for and compete in the 2024 open enrollment period, and strategies to compete in general in the Medicare market in Georgia, and they are precisely the types of information that a competitor like Sonder could use to undercut gain a competitive advantage over Elevance Health in the Georgia Medicare market.

90.     Given the nature of the information, Gonzalez inevitably will use and disclose those trade secrets in the course of providing services to Sonder.

91.     Thus, Gonzalez threatens to intentionally, wrongfully, willfully, and maliciously misappropriate Elevance Health's trade secrets and other confidential/proprietary information.

92.     By virtue of the foregoing, Elevance Health has demonstrated a likelihood of success and that a balancing of the equities favors the issuance of an injunction against Gonzalez.

93.     Gonzalez's threatened misappropriation would cause irreparable harm to Elevance Health for which it has no adequate remedy at law.  Elevance Health cannot presently ascertain

the exact extent, nature, and amount of such potential injury, which may not stand subject to precise calculation.

94.     As such, monetary damages alone cannot fully compensate Elevance Health for Gonzalez's threatened conduct.

95.     Elevance Health stands without an adequate remedy at law, and, unless restrained by the Court, Gonzalez's threatened misappropriation will cause Elevance Health irreparable damage and injury.

96.     The threatened harm to Elevance Health if the Court does not grant such restraint outweighs the risk of harm to Gonzalez from such a restraint.

97.     The public interest would not be disserved by the granting of an injunction.

**REQUESTED RELIEF**

WHEREFORE, Elevance Health requests that the Court grant the following relief:

1.     That Gonzalez, along with his agents, employers, employees, attorneys and those persons in active concert or participation with his, be enjoined through a preliminary injunction and permanent injunction from violating the Equity Agreements and from misappropriating or disclosing Elevance Health's trade secrets and other Confidential Information and trade secrets; and ordering Gonzalez to cause the identification and return of any Elevance Health trade secrets or other confidential information provided or disclosed to Sonder;

2.     That any preliminary or permanent injunction incorporate a tolling provision, whereby the protected periods specified in the Equity Agreements are tolled and extended for the length of time in which the Court determines that Gonzalez violated the Equity Agreements;

3.     That Elevance Health be awarded compensatory damages in an amount to be proven at trial;

4.      That Elevance Health be awarded its costs and attorneys' fees incurred in bringing this action; and

5.      That the Court grant such further relief as it deems just.

Respectfully Submitted,

Dated:  August 15. 2023                    By:  */s/ Kandi Kilkelly Hidde*
                                       Kandi Kilkelly Hidde, #18033-49
                                       Darren A. Craig, #25534-49
Cameron S. Trachtman, #36387-49
FROST BROWN TODD LLP
111 Monument Circle, Suite 4500
P.O. Box 44961
Indianapolis, IN  46244-0961
Telephone:      (317) 237-3800
Facsimile:      (317) 237-3900
Email:          khidde@fbtlaw.com
                 dcraig@fbtlaw.com
                 ctrachtman@fbtlaw.com

Daniel P. Hart (pro hac vice to be filed)
Travis M. Cashbaugh (pro hac vice to be filed)
SEYFARTH SHAW LLP
1075 Peachtree Street, N.E.
Suite 2500
Atlanta, GA 30309-3958
Telephone:      (404) 885-1500
Facsimile:      (404) 892-7056
Email:          dhart@seyfarth.com
                 tcashbaugh@seyfarth.com

*Counsel for Elevance Health, Inc.*

## <u>VERIFICATION</u>

I, Rhonda Clark, the Vice President Medicare Chief Growth Officer for Elevance Health, Inc. declare under penalty of perjury (28 U.S.C. § 1746) that I have read Paragraphs 1-3, 10-44 and 46-51 in the Verified Complaint and Request for Temporary and Permanent Injunctions and that the facts stated in it are true to the best of my knowledge and belief.

Executed on August ___14___, 2023.

*Rhonda Clark*

_____
Rhonda Clark